UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


RSDC HOLDINGS, LLC                                    CIVIL ACTION

VERSUS                                                NO. 16-3573

M.G. MAYER YACHT SERVICES,                            SECTION M (5)
INC., ET AL.


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter involves disputes concerning unpaid vessel repairs.  Defendant M.G. Mayer

Yacht Services, Inc. ("Mayer Yacht") filed two liens on the vessel, which plaintiff RSDC

Holdings, LLC ("RSDC") sought to have removed by filing the complaint initiating this maritime

action.[1]  Mayer Yacht denied that RSDC was entitled to have the liens removed and sued RSDC

in counterclaim and Donald Calloway ("Calloway") by third-party complaint seeking to recover

the unpaid amounts for the vessel repairs.[2]  RSDC and Calloway denied any liability.[3]

The matter was tried before the Court, sitting without a jury, over one day.  Having

considered the evidence admitted at trial and the argument of counsel, the Court announces its

Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil

Procedure.  To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as

---

[1] R. Doc. 1.
[2] R. Docs. 10, 16 & 51.  Calloway is the sole member of RSDC, a limited liability company.  R. Doc. 1 at 1.
The parties dispute the point at which Calloway became a member of RSDC, but it is undisputed that Richard
Sanderson ("Sanderson"), a business associate of Calloway, formed RSDC (a named formed by using the first initials
of Richard Sanderson Donald Calloway) in October of 2012, and assigned his interest in RSDC to Calloway in
December of 2015.  Calloway testimony.  Calloway was listed as an original member of RSDC, *see* Exh. 19, but
testified that he was not aware of RSDC's formation in 2012 and that Sanderson must have forged his signature to the
corporate documents.  R. Doc. 113 at 9; Calloway testimony.  Mayer Yacht originally sued RSDC because it was
listed as the vessel owner on the date suit was filed.  Upon discovering in this case that Calloway owned the vessel in
his personal capacity at the time Mayer Yacht did work on it, Mayer Yacht filed its third-party complaint adding
Calloway to the suit. *See* R. Doc. 51.
[3] R. Doc. 59.

such.  To the extent that a conclusion of law constitutes a finding of fact, the Court adopts it as such.

**FINDINGS OF FACT**

**I.     JURISDICTION**

1.      This Court has jurisdiction over the claims in the complaint under the admiralty and maritime laws of the United States, 28 U.S.C. § 1333, and Rule 9(h) of the Federal Rules of Civil Procedure.

2.      This Court has jurisdiction over the claims in the counterclaim and third-party complaint under the admiralty and maritime law of the United States, 28 U.S.C. § 1333, and Rule 9(h) of the Federal Rules of Civil Procedure.  In addition, any claims which do not fall within this Court's admiralty and maritime subject-matter jurisdiction are within the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

**II.    THE COMPLAINT, ANSWER, COUNTERCLAIM AND THIRD-PARTY COMPLAINT**

3.      On April 22, 2016, RSDC filed a complaint against Mayer Yacht seeking a declaratory judgment that the *Tuna Taxi* is not subject to two liens Mayer Yacht filed with the U.S. Coast Guard's National Vessel Documentation Center.[4]  RSDC also sought an award of costs and attorney's fees under 46 U.S.C. § 31343, including, specifically, any costs RSDC incurred for surety bonds serving as substitute security for the lien claims asserted by Mayer Yacht.[5]

4.      On August 26, 2016, Mayer Yacht filed its answer, generally denying the allegations of the complaint and specifically denying that RSDC is entitled to have the liens removed.  In addition, Mayer Yacht filed a counterclaim seeking to recover from RSDC the unpaid

---

[4] R. Doc. 1 at 1 & 3.
[5] *Id.* at 3.

amount of the vessel repairs.[6]  On February 2, 2017, RSDC answered the counterclaim denying that it owed anything for the alleged vessel repairs.[7]

5.     On September 7, 2017, Mayer Yacht filed an amended counterclaim against RSDC and a third-party complaint against Calloway *in personam* and the *Tuna Taxi in rem* seeking to recover for the vessel repairs.[8]  Mayer Yacht asserted claims for suit on open account under Louisiana law, breach of contract, *quantum meruit*, and detrimental reliance, seeking to recover the amount of the repairs (as invoiced), interest and late charges, attorney's fees, and collection costs and expenses.[9]

6.     On January 8, 2018, RSDC and Calloway answered the counterclaim and third-party complaint denying that they owed any amount for the alleged vessel repairs.[10]

## III.    SUMMARY JUDGMENT

7.     On July 26, 2018, RSDC and Calloway filed a motion for summary judgment, seeking dismissal of all of Mayer Yacht's claims. They first urged that Mayer Yacht's contract claims have the character of open-account claims and were prescribed because Mayer Yacht filed suit more than three years after the last invoice.[11]  In addition, RSDC and Calloway urged that Mayer Yacht's contract claims fail because Mayer Yacht lacked contractual privity with RSDC or Calloway.[12]  RSDC and Calloway also urged that Mayer Yacht's alternative claims for equitable relief should be dismissed because they were mere "gap fillers"[13] – that is, available only if no other claims had been asserted.  Mayer Yacht responded that its claims were not prescribed because

---

[6] R. Docs. 10 & 16.
[7] R. Doc. 24.
[8] R. Doc. 51.  On July 26, 2018, the Court granted Mayer Yacht's motion to dismiss without prejudice its *in rem* claim against the *Tuna Taxi*.  R. Doc.  77.
[9] R. Doc. 51.
[10] R. Doc. 59.
[11] R. Docs. 78 at 1; 99 at 4-5.
[12] R. Doc. 78 at 1.
[13] R. Doc. 99 at 4-5.

they sound in contract, which has a prescriptive period of ten years rather than the three years applicable to open-account claims; that Sanderson, Calloway's business associate, acted as agent, with either actual or apparent authority, to bind Calloway as principal in connection with the vessel repairs; and that Sanderson, acting on behalf of the owner, is presumed to have authority to procure necessaries under the Federal Maritime Lien Act.[14]  In their reply, RSDC and Calloway argued that Sanderson lacked actual authority to order repairs beyond the bridge reassembly;[15] that an apparent agency theory fails because Mayer Yacht never believed it contracted with the principals (whether RSDC or Calloway); and that the Federal Maritime Lien Act is inapplicable to Mayer Yacht's *in personam* claims for damages.[16]  In particular, to support their request that Mayer Yacht's contract claims be dismissed, RSDC and Calloway pointed both to the invoices as being addressed solely to Sanderson, and to Michael Mayer's deposition testimony that Mayer Yacht did not contract directly with either RSDC or Calloway.[17]

8.     On August 7, 2018, Mayer Yacht filed its cross-motion for summary judgment, seeking (1) dismissal of RSDC's suit to have the *Tuna Taxi* declared free of liens and (2) judgment in Mayer Yacht's favor on the issues of liability and damages asserted in its third-party complaint against Calloway (the same claims RSDC and Calloway sought to have dismissed by their own motion for summary judgment).[18]  The parties largely repeated the arguments summarized above in connection with RSDC and Calloway's motion for summary judgment.  In its reply, Mayer Yacht argued that even if Sanderson lacked actual or apparent authority, Calloway is nonetheless

---

[14] R. Doc. 87 at 6-9.
[15] The bridge had been removed from the body of the vessel for transport from California to New Orleans. Calloway testimony.
[16] R. Doc. 99 at 2-3, 5.
[17] *Id.*
[18] R. Doc. 83 at 1.  Mayer Yacht did not ask for summary judgment on its claims against RSDC.  Nor did it press those claims at trial.

bound because he ratified Sanderson's conduct.[19]  Mayer Yacht also noted it had dismissed its

open-account claim, because it had come to believe that the true nature of its cause of action

involved the breach of a maritime contract.[20]

9.      On November 26, 2018, the Court issued its Order & Reasons denying each side's

motion for summary judgment.[21]  Though there was no express contract between Mayer Yacht and

Calloway, the parties essentially agreed on summary judgment that Calloway authorized

Sanderson to order the *Tuna Taxi*'s bridge reassembly.[22]  But the Court observed that, if Sanderson

ordered further repairs, Mayer Yacht did not point to undisputed evidence establishing that

Sanderson acted with actual or apparent authority to do so.[23]  Similarly, the Court determined that

the question of ratification was also disputed and could not be resolved on summary judgment.[24]

Further, the parties disputed the nature and extent of the repairs that gave rise to the liens Mayer

Yacht filed.  Given these disputed material facts, the Court denied summary judgment in favor of

Mayer Yacht on its motion.[25]

10.     The Court also denied RSDC and Calloway's motion for summary judgment as to

Mayer Yacht's claims for breach of contract and detrimental reliance.  The Court determined that

factual disputes existed on the issues of contractual privity and agency.  In addition, this Court

concluded that the doctrine of laches did not bar Mayer Yacht's claim for breach of a maritime

contract.[26]  Because the parties had not presented evidence on Mayer Yacht's claim for detrimental

reliance, the Court concluded that neither side was entitled to summary judgment on it. [27]  Finally,

---

[19] R. Doc. 102 at 1-6.
[20] *Id*. at 6-7.  *See* R. Doc. 100.
[21] R. Doc. 114.
[22] *See* R. Docs. 99 at 3; 83-3 at 3.
[23] R. Doc. 114 at 9.
[24] *Id.* at 9-10.
[25] *Id.* at 10.
[26] *Id.* at 10-16.
[27] *Id.* at 18.

the Court granted summary judgment dismissing Mayer Yacht's claim for *quantum meruit* because it had asserted another theory for recovery.[28]

## IV.    FACTS ESTABLISHED BY EVIDENCE PRESENTED AT TRIAL

11.    This maritime action arises out of two liens on the *Tuna Taxi* filed by Mayer Yacht for allegedly unpaid vessel repairs.[29]

12.    On or about December 31, 1997, Ron Steinberg ("Steinberg") purchased the *Tuna Taxi*, a 48-foot ocean sport fishing vessel.[30]

13.    On or about May 23, 2012, Steinberg filed for bankruptcy in the United States Bankruptcy Court for the Central District of California.  Schedule B of the bankruptcy filings listed the *Tuna Taxi* as an asset of the debtor with an estimated value of $200,000.[31]

14.     At some time prior to October 2012, First NBC Bank ("FNBC") acquired the promissory note and mortgage executed by Steinberg in favor of debis Financial Services, in connection with his purchase of the *Tuna Taxi*.[32]

15.    On or about October 29, 2012, Calloway paid $65,000 to FNBC to acquire the *Tuna Taxi* as part of an extra-judicial foreclosure – a sale confirmed by an internal bank memorandum.[33] Despite this change in ownership, no effort was made by Calloway to change the registered name of the owner, which remained Ron Steinberg until sometime in 2016, after this case was filed in which RSDC claimed to be the vessel owner.[34]

---

[28] *Id.* at 16-17.

[29] Exhs. 4 & 5; R. Docs. 1 & 51.

[30] R. Doc. 113 at 6.

[31] *Id.* at 7.

[32] *Id.*

[33] *Id.*; *see also* R. Docs. 21 & 22; Calloway testimony.

[34] R. Doc. 113 at 9.  In June of 2016, two months after the captioned case was filed, RSDC commenced a declaratory judgment action in this Court (but not in the section of Court to which the captioned civil action had been allotted) to have itself declared the owner of the *Tuna Taxi*.  *See RSDC Holdings, LLC v. Steinberg*, Civ. Action No. 16-09381 (E.D. La. complaint filed June 9, 2016).

16.     Mayer Yacht contends that, as of October of 2012, Calloway believed himself to be owner of the *Tuna Taxi*, having testified as much.  RSDC and Calloway dispute this, claiming that the act of transfer, endorsement, assignment, and subrogation of the note between Calloway and FNBC dated August 14, 2014, mark the first moment of Calloway's ownership.[35]  However, the Court notes that these documents purport to memorialize a transfer of ownership to RSDC, not to Calloway.  Calloway's testimony revealed that, after October of 2012, he acted in every respect to the *Tuna Taxi* as its owner, having made the $65,000 payment for the vessel by personal check, taking physical possession of the vessel, transporting it cross country, and placing it in the custody of an agent and two different shipyards for purposes of repair and berthing.[36]  To the extent that discrete facets of Calloway's testimony can be read as contradicting the fact of his ownership of the *Tuna Taxi* as of October 2012, the Court finds such testimony not to be credible and, instead, credits the other portions of Calloway's testimony reflecting conduct consistent with his status as owner of the vessel.[37]  Thus, the Court finds that, at all times material to the vessel repairs performed by Mayer Yacht (that is, between November 2012 and July 2013), Calloway, not RSDC, was the owner of the *Tuna Taxi*, even though RSDC is the current owner of the vessel.

17.     Following the payment Calloway made to FNBC in October of 2012, Calloway and Sanderson traveled to Laguna Beach, California, where they met Steinberg and were given the keys to the vessel.[38]  At a bare minimum, then, as of October 2012, Calloway was the agreed buyer of the *Tuna Taxi* in possession of the vessel.

18.     Calloway had learned of the availability of the *Tuna Taxi* through Sanderson.

---

[35] Exhs. 3 & 20.

[36] Calloway testimony.

[37] *Id*.  It is notable that a witness called by RSDC and Calloway, Joseph Granzin, who was engaged by Calloway in 2016 to perform work on the *Tuna Taxi*, testified that he understood Calloway to be the owner of the vessel and was not aware of RSDC.  Granzin testimony.

[38] R. Doc. 113 at 7; Calloway testimony.

Calloway was introduced to Sanderson by Calloway's acquaintance, the warden of a jail where Sanderson had been imprisoned.[39]

19.　Once in California, Calloway and Sanderson arranged for the *Tuna Taxi* to be hauled out of the water, placed on a truck, and shipped to Mayer Yacht's yard in New Orleans, Louisiana.[40]

20.　At no time prior to taking possession of the vessel or having it shipped to New Orleans did Calloway arrange for an inspection or survey of the vessel or take the opportunity to examine the vessel's mechanic who was present when he first boarded the vessel in California.[41]

21.　In order for the vessel to be transported from California to New Orleans, its bridge had to be removed from the main body of the vessel.[42]　At a minimum, then, upon arriving in New Orleans, the bridge would need to be reattached.

22.　Upon the vessel's arrival at Mayer Yacht's yard in New Orleans, Calloway instructed Sanderson to communicate with the yard's owner, Michael Mayer, regarding the work to be done on the *Tuna Taxi*.[43]

23.　Calloway acknowledged that he intended and expected Sanderson to communicate with Mayer Yacht concerning all matters relating to repairs of the vessel, serving as Calloway's agent for this purpose ("he was the person I was working with. …　I told him to please deal with him because I'm not.").[44]

24.　At no time did Calloway communicate with any representative of Mayer Yacht about repairs to be made to the *Tuna Taxi*.[45]

---

[39] *Id.*
[40] R. Doc. 113 at 7; Calloway testimony.
[41] Calloway testimony.
[42] *Id.*
[43] R. Doc. 113 at 7; Calloway testimony.
[44] Calloway testimony.
[45] R. Doc. 113 at 7; Calloway testimony; Mayer testimony.

25.     At all times material, Mayer Yacht communicated only with Sanderson regarding repairs to be performed on the *Tuna Taxi*.[46]

26.     On or about November 16, 2012, Mayer Yacht entered into a contract (in the form of a work order) for repairs to the *Tuna Taxi*. Sanderson signed the contract with Mayer Yacht.[47] The Court expressly finds that the contract was entered into by Sanderson as the agent for Calloway as vessel owner. After all, as Calloway himself acknowledged, Sanderson had no ownership interest in the vessel and was engaged by Calloway to deal on his behalf with Mayer Yacht concerning the vessel.[48]

27.     While Calloway testified that he never intended Sanderson to have Mayer Yacht perform any repair work because of Mayer's purported unreliable reputation in the business community, Calloway also admitted that he submitted payment for the bridge repair and intended Sanderson to communicate with Mayer Yacht about the vessel repairs.[49] Moreover, Calloway took no action to divert the vessel's delivery away from Mayer Yacht's yard upon its arrival in New Orleans or to countermand any communication Sanderson made to Mayer Yacht about the repairs to be made to the *Tuna Taxi*. Instead, Calloway testified that he desired Sanderson to act as intermediary between him and Mayer Yacht in connection with the vessel repairs, and Calloway provided funds to Sanderson to pay Mayer Yacht for its work.[50]

28.     Sanderson directed Mayer to complete repairs to the *Tuna Taxi* pursuant to the work order dated November 16, 2012, which provides, in part, that "invoices unpaid thirty (30) days from presentation thereof, shall be subject to a finance charge of 18% annum" and that "any costs

---

[46] *Id.*
[47] Exh. 7.
[48] Calloway testimony.
[49] *Id*.
[50] *Id*.

incurred in collecting this account, including attorneys' fees shall be charged against the vessel and/or owner, and the owners and/or vessel agree to pay such costs of collection, including attorneys fees."[51]

29.     Although acknowledging that he expected Mayer Yacht to require Sanderson to sign a contract before it started work on the *Tuna Taxi*, Calloway testified that he made no inquiry of Sanderson about the contract and did not request to review any contract that Sanderson may have executed for work done on his behalf on his vessel.[52]

30.     The parties dispute the extent of repairs that Sanderson requested and that Mayer Yacht ultimately performed.  While Calloway contends that the only repair Sanderson authorized or Mayer Yacht performed was that of the bridge reassembly, Mayer Yacht claims that Sanderson authorized and it performed all of the work reflected on the invoices through July of 2013.

31.     Calloway testified that the boat was in good mechanical and cosmetic condition before it was transported from California to New Orleans; that the work Mayer Yacht claims to have performed was not performed; and that none of the work alleged to have been performed needed to be performed.[53]   In particular, Calloway testified repeatedly that Mayer Yacht did not replace granite and flooring on the vessel, which Michael Mayer confirmed in his own testimony but explained that Mayer Yacht never was engaged to do so, has not invoiced for such work, and does not seek recovery for such work.[54]   The Court does not find Calloway's testimony on the extent of the authorized work to be credible, largely because he did not address the specific details of Mayer Yacht's invoices and because the details concerning cosmetic work he did address are contradicted by other, more credible testimonial and documentary evidence.

---

[51] Exh. 7; R. Doc. 113 at 8.
[52] Calloway testimony.
[53] *Id*.
[54] *Id*.; Mayer testimony.

32.     Similarly, boat mechanic Joe Granzin d/b/a Onsite Marine Services testified that he was very familiar with the condition of the *Tuna Taxi* and that the work alleged to be performed by Mayer Yacht was not performed.[55]  He bases these conclusions on the fact that he was engaged in 2016 to perform certain other work on the *Tuna Taxi*.[56]  However, Granzin has no personal knowledge concerning the work that was or was not performed by Mayer Yacht in the 2012-2013 timeframe, except as might have been evident from the condition of the vessel he observed in 2016 at the time of his own work.  Mayer testified that the work Granzin performed was different from that done by Mayer Yacht.[57]  On this point, the Court specifically credits Mayer's testimony over that of Granzin.  For example, Granzin said he changed the main batteries; performed electrical and caulking work; performed routine engine maintenance like changing fuel filters, engine oil, and coolant; and made repairs to a bilge pump, a solenoid switch, and a generator.[58]  Except for work on the vessel's onboard computer system, which was also addressed at length by Mayer Yacht, the tasks performed by Granzin are different from those done by Mayer Yacht, which included, primarily, the bridge reassembly consisting of reattaching the hard top bridge components to the main body of the vessel, reshaping the fiberglass, identifying, matching, and reattaching wires for the electrical and electronic systems, and reattaching or reconnecting antenna, hydraulic engine controls, radar, and air conditioning components, as well as the seating configuration on the bridge; but also included, for example, sanding and painting the vessel's bottom and removing the tuna-specific fishing components.[59]

33.     Granzin also testified that the hourly rates of around $100 for yacht repairs charged

---

[55] Granzin testimony.
[56] *See* Exhs. 30 & 31.
[57] Mayer testimony.
[58] Granzin testimony.
[59] Mayer testimony; Gros testimony; Exhs. 11A-V & 17.

by him and Mayer Yacht were about the same and were reasonable for this market.[60]

34.    A Mayer Yacht's yard manager during 2012-2013, Rene Gros, testified that he believed Sanderson was the vessel's owner at the time of Mayer Yacht's dealings with him, indicating that Sanderson acted as to third parties like Mayer Yacht as having the authority to make decisions with respect to the *Tuna Taxi*.[61]

35.    Accordingly, the Court expressly finds that from November 2012 to July 2013, Mayer Yacht performed work on the *Tuna Taxi* at the request of Sanderson as the vessel owner's representative,[62] and that Mayer Yacht sent invoices for this work to Sanderson as the vessel owner's representative.[63]

36.    The following invoices were submitted by Mayer Yacht to Sanderson as the vessel owner's representative:

a.    Invoice No. 4874, dated December 2, 2012, in the amount of $1,500.00.[64] A payment was made by Sanderson on behalf of Calloway on February 1, 2013, in the amount of $1,023.13, leaving a balance due of $476.87;[65]

b.    Invoice No. 4895, dated December 14, 2012, in the amount of $14,600.00;[66]

c.    Invoice No. 4928, dated December 30, 2013, in the amount of $380.00;[67]

d.    Invoice No. 4938, dated January 6, 2013, in the amount of $4,205.55;[68]

e.    Invoice No. 4960, dated January 13, 2013, in the amount of $4,669.05;[69]

---

[60] Granzin testimony.
[61] Gros testimony.
[62] Exhs. 6-9, 18; R. Doc. 113 at 8.
[63] Exh. 11A-V.
[64] Exh. 11A.
[65] The entire check was for $5,000.00, but a handwritten notation on the side of the check stated that $1,032.13 was for payment for work done on the "Ocean" (that is, the ocean sport fishing vessel *Tuna Taxi*) and the remaining $3,976.87 was for work done on the *Trojan*, a boat owned by Sanderson. Exh. 23; Calloway testimony; Mayer testimony.
[66] Exh. 11B.
[67] Exh. 11C.
[68] Exh. 11D.
[69] Exh. 11E.

f.      Invoice No. 5066, dated January 20, 2013, in the amount of $4,641.26;[70]

g.      Invoice No. 5079, dated January 25, 2013, in the amount of $332.50;[71]

h.      Invoice No. 5088, dated January 27, 2013, in the amount of $4,528.21;[72]

i.      Invoice No. 5078, dated January 28, 2013, in the amount of $95.00;[73]

j.      Invoice No. 5081, dated January 29, 2013, in the amount of $665.00;[74]

k.      Invoice No. 5091, dated January 30, 2013, in the amount of $760.00;[75]

l.      Invoice No. 5104, dated February 3, 2013, in the amount of $2,038.51;[76]

m.      Invoice No. 5095, dated February 4, 2013, in the amount of $47.50;[77]

n.      Invoice No. 5108, dated February 5, 2013, in the amount of $712.50;[78]

o.      Invoice No. 5119, dated February 6, 2013, in the amount of $47.50;[79]

p.      Invoice No. 5152, dated February 7, 2012, in the amount of $2,540.50;[80]

q.      Invoice No. 5149, dated February 17, 2013, in the amount of $767.00;[81]

r.      Invoice No. 5154, dated February 22, 2013, in the amount of $142.00;[82]

s.      Invoice No. 5173, dated February 24, 2013, in the amount of $485.95;[83]

t.      Invoice No. 5213, dated March 10, 2013, in the amount of $142.50.[84]

---

[70] Exh. 11F.
[71] Exh. 11G.
[72] Exh. 11H.
[73] Exh. 11I.
[74] Exh. 11J.
[75] Exh. 11K.
[76] Exh. 11L.
[77] Exh. 11M.
[78] Exh. 11N.
[79] Exh. 11O.
[80] Exh. 11P.
[81] Exh. 11Q.
[82] Exh. 11R.
[83] Exh. 11S.
[84] Exh. 11T.

37.     In February of 2013, in an effort to encourage payment of its outstanding invoices, Mayer Yacht issued a fifty percent credit totaling $10,472.15 on nine invoices (Invoice Nos. 5104, 5091, 5081, 5078, 5088, 5066, 4960, 4938, and 4928).   The amount remaining unpaid after applying the credit was $31,805.75. [85]

38.     On or about March 18, 2013, Mayer Yacht filed a lien with the National Vessel Documentation Center of the U.S. Coast Guard in the amount of $31,805.75, which represented the unpaid balance for the services performed by Mayer Yacht.[86]

39.     On or about March 28, 2013, Mayer Yacht received a payment of $5,000.00 from Sanderson, which reduced the outstanding balance for the work on the *Tuna Taxi* to $26,805.75.[87]

40.     On or about June 7, 2013, Sanderson made an additional payment of $2,000.00 in connection with a request for Mayer Yacht to do additional work on the vessel.[88] This payment reduced the outstanding balance to $24,805.75.

41.     On June 16, 2013, and July 14, 2013, Mayer Yacht submitted additional invoices, Nos. 5708 and 5790 in the amounts of $1,323.35 and $3,265.05, respectively, for the additional work done in June and July. These invoices, totaling $4,588.40, were again directed to Sanderson as the vessel's representative and Calloway's agent.[89]

42.     On or about July 24, 2013, failing receipt of payment from Calloway or anyone else, Mayer Yacht filed a second lien with the National Vessel Documentation Center of the U.S. Coast Guard, this one in the amount of $4,588.40.[90]

---

[85] R. Doc. 113 at 8; Mayer testimony.
[86] Exh. 4; R. Doc. 113 at 8.
[87] Exh. 24.
[88] Exh. 25.
[89] Exhs. 11U & 11V.
[90] Exh. 5; R. Doc. 113 at 8.

43.     The *Tuna Taxi* was moored at Mayer Yacht's dock from December 2012 to July 2013, with Mayer Yacht performing work on the vessel authorized by Calloway through his agent Sanderson.[91]

44.     Mayer Yacht released the *Tuna Taxi* to Calloway in July of 2013.[92]

45.     Mayer Yacht performed the work on the *Tuna Taxi* for which it invoiced Sanderson as the vessel's representative and owner's agent, and Mayer Yacht is entitled to be paid by Calloway, the vessel owner at the time and the principal for whom the work was done, for all amounts still owed on the invoices, together with 18% interest from the date due until paid, plus reasonable attorney's fees and costs and expenses Mayer Yacht incurred in seeking such recovery.

46.     As of the date of trial, the unpaid amount for the services performed on the *Tuna Taxi* by Mayer Yacht was $29,394.15, but this amount does not include interest, attorney's fees, or costs and expenses of collection.

47.     Both of the liens at issue were filed with the U.S. Coast Guard in 2013, but no evidence was adduced at trial to show that the liens have been renewed, reinscribed, or otherwise reinstated by Mayer Yacht.

## CONCLUSIONS OF LAW

1.     To establish a maritime lien for necessaries such as ship repairs, the lienholder must prove that it provided "necessaries to a vessel on the order of the owner or a person authorized by the owner."  46 U.S.C. § 31342; *see Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 223-24 (5th Cir. 1999).

---

[91] Mayer testimony.
[92] R. Doc. 1 at 2; Calloway testimony; Mayer testimony.

2.      Among those presumed to have the authority to procure necessaries for a vessel is the owner or an agent appointed by the owner or an agreed buyer in possession of the vessel.  46 U.S.C. § 31341.

3.      The services and materials provided to the *Tuna Taxi* by Mayer Yacht constituted necessaries provided on the order of a person authorized by the owner. *See Lake Charles Stevedores, Inc.*, 199 F.3d at 223-24. As such, the provision of these services gave rise to a maritime lien against the vessel.

4.      The question of an agent's status or authority is resolved under general principles of agency law.  *Lake Charles Stevedores, Inc.*, 199 F.3d at 226.  *But see Richard A. Cheramie Enters., Inc. v. Mt. Airy Ref. Co.,* 708 F.2d 156 (5th Cir. 1983) (applying Louisiana mandatary law and general agency law to analyze sufficiency of authority to give rise to maritime lien).

5.      "Mandate is a contract by which a person, the principal, confers authority on another person, the mandatory, to transact one or more affairs for the principal."  La. Civ. Code art. 2985.

6.      "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."  RESTATEMENT (THIRD) AGENCY § 2.01.  Under Louisiana law, the mandatary's (or agent's) authority is similarly composed of actual authority, expressed or implied, and the apparent authority which the principal has invested in him by his conduct.  *Jefferson Parish Hosp. Serv. Dist. No. 2 v. K & W Diners, LLC*, 65 So. 3d 662, 668 (La. App. 2011) (citing *Boulos v. Morrison,* 503 So. 2d 1, 3 (La. 1987)).

7.      "As between principal and agent the limit of the agent's authority to bind the principal is governed by the agent's actual authority.  As between the principal and third persons,

the limit of an agent's authority to bind the principal is governed by his apparent authority. ... Apparent authority is a judicially created concept of estoppel which operates in favor of a third party seeking to bind a principal for the unauthorized act of an apparent agent." *Boulos v. Morrison*, 503 So. 2d at 3 (citing *Broadway v. All-Star Ins. Corp.*, 285 So. 2d 536 (La. 1973); *Interstate Elec. Co. v. Frank Adam Elec. Co.*, 173 La. 103, 136 So. 283 (1931)).

8.      "Apparent authority is created as to a third person by conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him. Apparent authority is distinguished from actual authority because it is the manifestation of the principal to the third person rather than to the agent that is controlling." *Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985) (citing RESTATEMENT (SECOND) AGENCY § 27). Similarly, in order for apparent authority to apply under Louisiana law, "the principal must first act to manifest the alleged mandatary's authority to an innocent party. Then, the third party must reasonably rely on the mandatary's manifested authority." *Jefferson Parish Hosp. Serv. Dist. No.* 2, 65 So. 3d at 668.

9.      If the agent had neither actual, nor implied, nor apparent authority, the principal may still be bound to contracts made by an agent with a third party if the principal ratifies the agent's unauthorized acts. *See* RESTATEMENT (THIRD) AGENCY § 4. "A ratification is not effective unless it encompasses the entirety of an act, contract, or other single transaction." *Id.* § 4.07. Louisiana law provides that ratification occurs when "the principal, knowing of the contract, does not repudiate it but accepts its benefits." *Bamber Contractors, Inc. v. Morrison Eng'g & Contracting Co.,* 385 So. 2d 327, 331 (La. App. 1980). The party asserting ratification must prove that the principal clearly intended to ratify the act. *Id.*

10.      The *Tuna Taxi* was owned by Donald Calloway at all times while undergoing the

repairs at issue at Mayer Yacht's facility.

11.     Richard Sanderson was, at all times material, the agent for Calloway, the owner of the vessel.

12.     An agency relationship was clearly created between Calloway and Sanderson. At the time Calloway and Sanderson arrived at Mayer Yacht with the *Tuna Taxi*, Calloway acknowledged that he instructed Sanderson to communicate with Mayer Yacht regarding work to the *Tuna Taxi*. Calloway, as owner (or, at least, as agreed buyer in possession of the vessel) relied exclusively on Sanderson, as his agent, to contract with Mayer Yacht regarding work to be performed on the vessel. Calloway did not have communications with Michael Mayer regarding the *Tuna Taxi*, but all communications with Mayer Yacht concerning repairs to the vessel occurred through Sanderson. Further, as owner of the *Tuna Taxi* (or, at least, as agreed buyer in possession of the vessel), Calloway had a material interest in making the promise to pay for repair services to the *Tuna Taxi,* and he alone received the totality of the benefits of the work done to the vessel. At no time did Calloway inform Mayer Yacht that Sanderson did not have authority to direct work to be done to the vessel.

13.     Calloway, by his actions, clearly ratified the acts of his agent, Sanderson. He participated in the delivery of the vessel to Mayer Yacht; he instructed Sanderson to have all contacts and communications with Mayer Yacht regarding the work to be done to the vessel; he reimbursed Sanderson for at least a portion of the early invoices; he was aware that the vessel remained at Mayer Yacht's facility for months; and, he allegedly failed to make any effort to determine what, if any, work was taking place on the vessel or the condition of the vessel, other than occasionally "peek[ing] through the fence,"[93] leaving those details to Sanderson. Despite his

---

[93] Calloway testimony.

protestations, Calloway clearly continued to rely on Sanderson to have the vessel repaired and maintained as necessary. At no time did Calloway inform Mayer Yacht that Sanderson did not have authority to direct work to be done to the vessel.

14. Ratification occurs when the principal, knowing of the contract, does not repudiate but accepts its benefits. Here, Calloway acknowledged instructing Sanderson to contract with Mayer Yacht for work to be done to the vessel, acknowledged that either he owned the vessel or was an agreed buyer in possession of the vessel when the work was done, and acknowledged never communicating to Mayer Yacht that Sanderson was not authorized to act for the benefit of the vessel interest. Calloway did not repudiate the improvements to the vessel and received all benefit of the work done.

15. The agreement between Mayer Yacht and Sanderson constitutes a maritime contract.[94]

16. The doctrine of laches does not bar Mayer Yacht's claim for breach of contract.[95]

17. Sanderson, as Calloway's agent, requested Mayer Yacht to provide services to the *Tuna Taxi*. Invoices for this work were directed to Sanderson, and Calloway acknowledged paying a portion of these invoices through reimbursement to Sanderson. The Court finds that the services reflected in the invoices in evidence in this case were actually performed and that Calloway, as principal and vessel owner (or as agreed buyer in possession of the vessel) at the time the services were provided, breached the contract by failing to pay for the services. The contract provides, in part, that "invoices unpaid thirty (30) days from presentation thereof, shall be subject to a finance charge of 18% annum" and that "any costs incurred in collecting this account, including attorneys' fees shall be charged against the vessel and/or owner, and the owners and/or vessel agree to pay

---

[94] R. Doc. 114 at 14.
[95] *Id.* at 16.

such costs of collection, including attorneys fees."[96]

18.    The Court therefore concludes that Calloway is liable to Mayer Yacht for the full unpaid balance on the invoices of $29,394.15, plus interest at the contract rate of 18% per annum payable from the date each invoice was due, reasonable attorney's fees, and all other reasonable costs and expenses of collection.

19.    The Court also finds that Mayer Yacht is entitled to recover under its claim for detrimental reliance, having proved that (1) a representation was made to it by the word or conduct of Sanderson that the vessel's owner would pay for work done on the *Tuna Taxi*; (2) it justifiably relied on this word or conduct; and (3) it changed its position by performing the services in reliance on this word or conduct.  *Suire v Lafayette City-Parish Consolidated Gov't,* 907 So. 2d 37, 59 (La. 2005).  In short, Mayer Yacht justifiably relied upon the conduct or word of Sanderson as agent for Calloway in performing the *Tuna Taxi* repair work.

20.    "A notice of claim of lien recorded under subsection (b) of this section shall expire 3 years after the date the lien was established."  46 U.S.C. § 31343(e).  RSDC urges that the liens in this case were recorded by Mayer Yacht with the U.S. Coast Guard in 2013, and because the liens were not renewed, they have expired and should be vacated and set aside.  Mayer Yacht responds that a notice of lien need not be filed in order for the lien to be valid and enforceable because maritime liens are secret liens that are perfected when they arise.  The Court agrees.  The purpose of filing a § 31343 notice of lien with the U.S. Coast Guard is to afford notice to a subsequent purchaser or other third parties of the existence of the filer's claim against the vessel. *See*, *e.g.*, *Gammill v. Bradley T*, 879 F. Supp. 737, 741 (W.D. Ky. 1995).  Nonetheless, "[m]aritime liens can be secret and may operate to the prejudice of purchasers without notice."  *Id.* (citation

---

[96] Exh. 7.

omitted).  Maritime liens remain enforceable without a filing of a notice of lien, although the failure to record a lien, and the attendant lack of notice to a subsequent purchaser, may be a factor to weigh in assessing whether laches applies to an action to enforce the lien.  *Id.* at 741-42.  "The filing [of notices of lien] is permissive, not mandatory: the lien's status and rank are in no way affected by failure to file."  GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 9-72 (2d. ed. 1975); *see also id.* § 9-2; *Puerto Rico Ports Authority v. Barge Katy-B*, 427 F.3d 93, 104 (1st Cir. 2005) ("A maritime lien is silent and need not be recorded in order to retain its vitality.") (citing, *inter alia*, 46 U.S.C. § 31343 as "providing for permissive recording of a maritime lien"); *Beech v. FV Wishbone*, 113 F. Supp. 3d 1203, 1219 n.17 (S.D. Ala. 2015) (the Federal Maritime Lien Act, 46 U.S.C. § 31342, does not require the recording of liens, although a failure to do so is a factor to weigh in a laches defense asserted by a bona fide purchaser for value without notice).

21.     Here, Mayer Yacht timely filed its notices of lien with the U.S. Coast Guard.  The notices were filed within a short time following completion of the work at issue.  The notices identified the vessel's then-registered owner (Steinberg) and were accompanied by the supporting invoices.  These notices of lien advised third parties of Mayer Yacht's lien position, protecting against any defenses (including laches), until the notices expired.  The complaint initiating the captioned civil action was filed just one month after the 3-year filing anniversary of the first lien notice and months before the 3-year anniversary of the second lien notice.  In light of the secret nature of liens and RSDC's actual notice of the liens via this lawsuit and the notices of lien (though now expired), there was no prejudice to the vessel owner occasioned by Mayer Yacht's failure to renew the lien notices.  Nor would simple expiration of the notices of lien affect the validity of the liens themselves absent a showing of untoward delay or other prejudice to third parties (not

Calloway or RSDC).  Delay not amounting to laches does not affect the status of a lien, even as against third parties, much less an owner with actual notice of liens.  *See*, *e.g.*, *Pascagoula Dock Station v Merchants & Marine Bank*, 271 F.2d 53, 56-57 (5th Cir. 1959).  And the Court previously ruled that laches does not bar Mayer Yacht's maritime contract claim.  *See* Order and Reasons (R. Doc. 114) at 15.

22.     In view of this ruling, and until the judgment of this Court ordering payment to Mayer Yacht has been satisfied, Mayer Yacht's liens against the *Tuna Taxi* remain in place, although Mayer Yacht may be taking some risk as to any prospective purchaser of the *Tuna Taxi* or other third parties who have no notice of the liens since Mayer Yacht's notices of lien have expired under the terms of 46 U.S.C. § 31343(e).

23.     Pursuant to 46 U.S.C. § 31343(c)(2), the prevailing party in a civil action to declare that a vessel is not subject to a lien, or that the vessel is not subject to the notice of claim of lien, may be awarded costs and attorney's fees unless the other party's position was substantially justified or other circumstances make an award of costs and attorney's fees unjust.  *See Cianbro Corp. v. George H. Dean, Inc.*, 733 F. Supp. 2d 191 (D. Me. 2010) (a party's position is substantially justified if it has a reasonable basis in law and fact).  Here, the *Tuna Taxi* is subject to a lien in favor of Mayer Yacht, as Mayer Yacht contends, even if the vessel is not subject to the notices of lien, as RSDC and Calloway contend.  Under these circumstances, an award of costs and attorney's fees is not warranted to either party under 46 U.S.C. § 31343 because the Court finds that each party's position on this isolated issued is substantially justified.

## V.    CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS ORDERED** that judgment be entered in favor of RSDC Holdings, LLC and against M.G. Mayer Yacht Services, Inc. on RSDC's complaint for declaratory judgment that the *Tuna Taxi* is not subject to the notices of liens in favor of Mayer Yacht, although the vessel remains subject to the maritime liens in favor of Mayer Yacht.

**IT IS FURTHER ORDERED** that judgment be entered in favor of M.G. Mayer Yacht Services, Inc. and against Donald Calloway on Mayer Yacht's third-party complaint in the amount of $29,394.15, together with a finance charge of 18% per annum calculated on the amount due on each invoice, reasonable attorney's fees, and reasonable costs and expenses of collection, all in accordance with the contract. Mayer Yacht is given fourteen (14) days from the date of this order to submit competent evidence supporting its claim for attorney's fees, costs and expenses, and to quantify its claim for prejudgment interest under the contract (*i.e.*, the 18% per annum finance charge). Calloway is given fourteen (14) days from the date of Mayer Yacht's filing to file any opposition.

**IT IS FURTHER ORDERED** that judgment be entered dismissing with prejudice M.G. Mayer Yacht Services, Inc.'s counterclaim against RSDC Holdings, LLC.

New Orleans, Louisiana, this 1st day of February, 2019.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE